PENINSULAR TRANSPORTATION COMPANY, INC., Respondent, *v.* GREATER BRITAIN INSURANCE CORPORATION, LTD., Appellant.

First Department, April 21, 1922.

Judgments — motion for summary judgment under Rules of Civil Practice, rule 113, denied — such motion denied unless it is perfectly plain that there is no substantial issue to be tried — remedy of moving party where motion denied.

Plaintiff's motion under rule 113 of the Rules of Civil Practice for summary judgment and to strike out the answer should not have been granted in an action on a policy of insurance issued to the plaintiff as owner of a schooner, where it appeared that there were issues duly joined with respect to the subject and amount of the insurance and the cause and extent of the loss which cannot be determined summarily on conflicting affidavits, unless the parties waive their right to have them determined on common-law evidence on the trial.

A motion under rule 113 of the Rules of Civil Practice to strike out the answer and for summary judgment should be denied, unless it is perfectly plain that there is no substantial issue to be tried, and where the action is triable in the First Judicial District, New York county, the moving party should be left to his remedy by placing the cause on the general calendar and moving under rule 6 of the Trial Term Rules of the Supreme Court in said county to have the cause placed on the day calendar for trial on the ground that there is no substantial defense to the action or that the answer was not interposed in good faith or was interposed for the purpose of delay.

APPEAL by the defendant, Greater Britain Insurance Corporation, Ltd., from an order of the Supreme Court, made at the New York Special Term and entered in the office of the clerk of the county of New York on the 21st day of November, 1921, granting plaintiff's motion to strike out the answer herein, and for judgment pursuant to rule 113 of the Rules of Civil Practice, also from a judgment of the Supreme Court in favor of the plaintiff entered pursuant to said order in said clerk's office on the 29th day of November, 1921, and also from an order entered in said clerk's office on the 5th day of January, 1922, denying defendant's motion to vacate said order and judgment and for permission to file an amended answer.

The order striking out the answer was made on plaintiff's motion under rule 113 of the Rules of Civil Practice, which is as follows:

" Rule 113. Summary judgment. When an answer is served in an action to recover a debt or liquidated demand arising,

" 1. on a contract, express or implied, sealed or not sealed; or

**696** Peninsular T. Co., Inc., *v.* Greater B. Ins. Corp., Ltd.

First Department, April, 1922. [Vol. 200

" 2. on a judgment for a stated sum;

the answer may be struck out and judgment entered thereon on motion, and the affidavit of the plaintiff or of any other person having knowledge of the facts, verifying the cause of action and stating the amount claimed, and his belief that there is no defense to the action; unless the defendant by affidavit, or other proof shall show such facts as may be deemed, by the judge hearing the motion, sufficient to entitle him to defend."

The complaint shows that the plaintiff is a Delaware corporation and that the defendant is a corporation organized under the laws of the Kingdom of Great Britain; that prior to the 9th of February, 1921, the parties entered into a contract in writing by which the defendant, in consideration of a premium paid therefor, insured the plaintiff *as owner* of the schooner *Charles G. Endicott* in the principal sum of about $17,000 against " all consequences of hostilities or warlike operations, whether before or after declaration of war, and against loss of, or damage to the Schooner ' Charles G. Endicott ', caused by mines, and/or torpedoes, and/or other engines of war; " that by virtue of the contract the plaintiff, in the event of loss from one of the causes so insured against, was entitled to payment of the principal sum together with interest thereon and the costs incurred in collecting the same; that on the 9th of February, 1921, the schooner, which was owned by the plaintiff and so insured, was lost at sea as the result of damage caused by a mine " and/or other engines of war and in consequence of hostilities or warlike operations committed after the declaration of war; " that the defendant thereupon became liable to plaintiff in the sum of about $17,000, with interest thereon from February 9, 1921, and costs and expenses; that the interest and expenses to the date of the verification of the complaint amount to $6,765, making a total of $23,675, for which the plaintiff demanded judgment. The answer, which is also verified, admits the incorporation of the defendant and denies that it has any knowledge or information sufficient to form a belief with respect to the allegations concerning the incorporation of the plaintiff, and upon information and belief denies each and every other allegation of the complaint. This form of pleading is authorized by the Civil Practice Act (§§ 261, 276); but the denial with respect to the incorporation of the plaintiff was insufficient to require proof of its incorporation to be made upon the trial. (Rules of Civil Practice, rule 93.)

*Barry, Wainwright, Thacher & Symmers* [*Herbert Barry* of counsel], for the appellant.

*DeLancey Nicoll, Jr.*, of counsel, for the respondent.

LAUGHLIN, J.:

The motion to strike out the answer was made on the pleadings, on depositions *de bene esse* of five members of the crew of the schooner, which were taken pursuant to the order of the court herein, and also on their affidavits, the affidavits of two other members of the crew and on affidavits made by the president of the plaintiff, the president and the vice-president of the brokerage corporation which placed this insurance, and the attorney for the plaintiff. The depositions and affidavits of the members of the crew tend to show that the preceding voyage of the schooner was from Portugal to Gloucester, Mass., with a cargo of salt and some champagne, port wine and vermuth which was brought over by the captain; that the cargo of salt was unloaded at Gloucester and the schooner then sailed to New York for refitting, and thereafter to Newport News, and was anchored in Hampton Roads; that a trunk full of brick and other material was there brought on board and emptied, and the champagne, wine and vermuth were taken ashore in the trunk; that for several days, while the schooner was anchored in Hampton Roads, after the crew had been discharged and the captain had gone to New York on business in reference to the previous voyage, the only persons on board were the engineer, who was an office employee of the plaintiff and, to the knowledge of the captain, had shipped under an assumed name and was also the brother of a director of the brokerage company which placed the insurance on the schooner, and one Joe Vasconcellos, a brother of the plaintiff's president; that after the captain returned, the schooner was taken to a dock at Norfolk and took on a cargo of 811 tons of coal consigned to Manzanilla, Cuba; that at Norfolk an entire new crew of eight men was taken on board, and the schooner, after lying in Hampton Roads for nine or ten days awaiting favorable wind, was towed out to sea by a tug on the 31st of January, 1921, and sailed for Manzanilla; that the crew was divided into two watches, one in charge of the mate, and the other in charge of the boatswain; that the schooner was seaworthy and in good condition and had two pumps, the forward of which was steam and the other gasoline, and it was necessary to work both of them a few minutes twice a day to pump out the water that leaked in; that the gasoline, about forty gallons in all, was kept in tin cans in the windlass room forward of the engine room; that, while on watch, one of the crew was at the wheel and the other on lookout forward of the forward deck house; that as neither the captain, the engineer nor the cook stood a regular watch, there were on watch only a seaman at the wheel, the forward lookout and the mate or boatswain in charge of them; that the schooner encountered pleasant weather and was making

**698** Peninsular T. Co., Inc., *v.* Greater B. Ins. Corp., Ltd.

First Department, April, 1922.                    [Vol. 200

about seven knots an hour with all sails, excepting the topsails, set, with the boatswain and his watch on duty at about ten o'clock on the evening of the ninth, and she was about sixty miles off the easterly end of Cuba when a loud report was heard and the schooner shook, and the boatswain thought a man of war was firing on them, and water and flame was seen going up ten to fifteen feet above the deck abreast the main rigging on the starboard side, but neither the deck nor the hatches were blown up, and the schooner listed to port and then came back, and the captain ordered the pump wells sounded, and the mate reported eight feet of water forward, and the sails were ordered lowered and a boat was launched, and the crew entered it and abandoned the schooner; that neither pump was working at the time of the explosion, but the gasoline pump was started immediately thereafter; and the schooner continued to float, settling down gradually at the bow until about one A. M., when she disappeared; and the crew landed the next afternoon on the coast of Cuba; that two other vessels commanded by the captain of the schooner had sprung leaks and been lost at sea. No attempt was made to discover where the hole in the vessel was other than by looking down a small hatchway in the windlass room and seeing water coming in over the coal. One of the seamen, who was off watch but had been on deck just before the explosion and had gone back into the forecastle, testified that he looked down about the main rigging and saw a lot of flame and water coming up into the air on the starboard side; that the explosion sounded like the discharge of a gun, and he thought that it occurred outside the schooner; that the schooner did not take fire and he smelled no smoke; that he and the boatswain went into the windlass room and took off the hatch and looked into the hold with a searchlight and saw water coming in over the coal but that he did not go over and take a look at the point where he had seen the fire and water come up. The seaman at the wheel testified that " something struck — looked like a six inch gun, right in our main rigging, at the after chainplate, and a stream of fire and water went up; " and that the explosion knocked him off his feet and killed the headway of the ship, but he observed no damage done to the deck; and that " where the water came up, it was from the outside, it was by the main rigging and the after chain plates." He did not see the hole in the side of the ship or look for it. The affidavit of the engineer was to the effect that he was in his berth on the starboard side when the explosion occurred, and the window over his port and one in the engine room were blown in. The affidavit of the president of Frank B. Hall & Co., which as broker placed the insurance, shows that the insurance on the schooner was $176,000,

and that it was payable to the plaintiff and that his company investigated the loss and became satisfied that it was caused by a mine, and prepared papers for the payment of the loss, and the American underwriters paid their share, amounting to $25,000. The affidavit of the president of the plaintiff charged that the answer was interposed for delay, and that there was no defense to the action.

An affidavit made by one of the attorneys for the defendant was read in opposition to the motion, to the effect that the policy on which the action was predicated was in London, and that he was informed by a cablegram from the defendant in London that the policy issued by it was only on the anticipated profits of the voyage and was limited to $5,000; that the defendant's attorneys had been advised by the United States district attorney at Norfolk, Va., that an investigation by the Federal authorities of the circumstances attending the loss of this schooner had led to the issuance of warrants against the president of the plaintiff and the engineer of the schooner; and that he had requested the attorneys for the defendant not to disclose for the present any evidence they might have with respect thereto lest such disclosure might prejudice the criminal prosecutions instituted by the Federal authorities and then pending; and that in his opinion the interests of justice required that defendant should not at that time disclose its evidence. There was also read in opposition to the motion an affidavit by an attorney for the American underwriters, to the effect that they were considering the advisibility of bringing an action to recover back the insurance paid by them on the schooner.

On the motion to vacate the order and for a reargument and for leave to amend, the defendant showed that the policy, which had then been received from London, was not as alleged in the complaint on the hull of the schooner, but was only on the anticipated profits of the charter on this voyage; that the freight charges on this cargo of coal amounted to only $5.50 per ton aggregating less than $5,000 and that they had been irrevocably paid in advance, so that there could be no loss sustained by the plaintiff; and that in the interim two members of the crew and the plaintiff's president and his brother had been indicted by a Federal grand jury for conspiracy to destroy the schooner; and that it was charged in the indictment that she was destroyed by members of the crew and not by a mine.

On that motion the defendant also presented affidavits made by two former lieutenants in the United States Naval Reserve, who during the World War had been attached to the United States Naval Mine Force for duty in connection with the laying of the North Sea mine barrage, and, after the armistice, in connection

with the sweeping and removal of that barrage, and who had observed the explosion of over 500 naval mines both during and after the war. Their affidavits were to the effect that they had read the depositions and affidavits presented in behalf of plaintiff, and that in their opinion the schooner was not sunk by a mine. There was also presented a letter from the Acting Secretary of the Navy dated March 28, 1921, to the effect that the Navy Department had never received information of a mine field in West Indian waters or of one so disposed as to make it probable that a mine might drift into that vicinity; and further that the German mine fields in the western hemisphere were known and had been swept clear of mines more than a year before. Another affidavit in support of the motion was made by a marine surveyor and appraiser, who surveyed this schooner while she was in dock in New York in December, 1920, to the effect that the market value at that time was not over $35,000. A further affidavit in opposition to the motion was made by one of the attorneys for the defendant, to the effect that, on inquiry among marine insurance men, he was informed that, although liberal valuations were allowed in valued policies on ships, sometimes to the extent of fifteen to thirty-five per cent above the value of the ship, nevertheless, the actual value remained the guiding principle of all marine underwriting, and that the affiant in his experience as a marine insurance lawyer had never heard of an instance in which the discrepancy between the actual value of the ship and its insured value was so great or anything like so great as in the present case.

It is quite obvious that the court was not authorized to strike out the answer. There were issues, duly joined, with respect to the subject and amount of the insurance, and the cause and extent of the loss. Such issues cannot be determined summarily on conflicting affidavits unless the parties waive their right to have them determined on common-law evidence on the trial. The complaint was on a policy of insurance to the owner on the hull. The judgment entered was for less than one-fifth of the amount demanded, and not for the loss of the hull but for loss of anticipated profits of the voyage consisting of the freight charges, which it now appears had been received by plaintiff in advance, with no recourse against it therefor predicated on the loss of the cargo at sea. The fact that the insurance was for a loss that could not be sustained, and that there was insurance on the hull and for more than five times the value thereof, and the other facts and circumstances rendered it quite improper for the court to pass upon the merits of the defense on affidavits, and plainly entitled the defendant to try the issues with respect to the subject of the insurance, amount of loss, if any,

sustained by plaintiff, and whether it resulted from a cause covered by the policy.   The purpose and scope of rule 113 of the Rules of Civil Practice were recently clearly and fully outlined and defined as definitely as may be in advance of the presentation of the facts of a particular case, by a unanimous opinion of this court written by Mr. Justice PAGE, who was chairman of the convention by which it was drafted.   (*Dwan* v. *Massarene*, 199 App. Div. 872.) The authority of the court on such an application is therein comprehensively stated as follows:   " The power is given to the court, but it is needless to say that it must be exercised with care and not extended beyond its just limits.   The court is not authorized to try the issue, but is to determine whether there is an issue to be tried.   If there is, it must be tried by a jury.   Plaintiff's affidavit must state such facts as are necessary to establish a good cause of action.   It will not be sufficient if it verifies only a portion of the cause of action, leaving out some essential part thereof.   It must state the amount claimed, and his belief that there is no defense to the action.   The defendant must show that he has a *bona fide* defense to the action, one which he may be able to establish.   It must be a plausible ground of defense, something fairly arguable and of a substantial character.   This he must show by affidavits or other proof.   He cannot shelter himself behind general or specific denials, or denials of knowledge or information sufficient to form a belief.   He must show that his denial or his defense is not false and sham, but interposed in good faith and not for delay."

That opinion requires no further elaboration, but merely thoughtful and patient consideration in applying it; and where it is not perfectly plain that there is no substantial issue to be tried, a motion under rule 113 to strike out the answer and for judgment should be denied (See *Lloyd's Banking Co.* v. *Ogle*, L. R. [1876] 1 Ex. Div. 262; 34 L. T. Rep. [N. S.] 584, 586; *Jones* v. *Stone*, L. R. [1894] App. Cas. 122; 70 L. T. Rep. [N. S.] 174; *Codd* v. *Delap*, 92 id. 510; *Jacobs* v. *Booth's Distillery Co.*, 85 id. 262; *Thompson* v. *Marshall*, 41 id. 720; *Yorkshire Banking Company, Ltd.*, v. *Beatson*, L. R. [1879] 4 C. P. Div. 213; *Fuller & Co.* v. *Alexander Bros.*, [1882] 47 L. T. Rep. [N. S.] 443; 52 L. J. Q. B. Div. [N. S.] 103; *Lynde* v. *Waithman*, L. R. [1895] 2 Q. B. Div. 180); and the moving party should be left to his remedy by placing the cause on the general calendar and moving under rule VI of the Trial Term Rules of the Supreme Court in the First Judicial District, New York county, to have the cause placed on the day calendar for trial on the ground that there is no substantial defense to the action or that the answer was not interposed in good faith or was interposed for the purpose of delay.

The orders appealed from are, therefore, reversed, with ten dollars costs and disbursements, and the plaintiff's motion to strike out the answer and for judgment is denied, with ten dollars costs, and the defendant's motion to set aside the order entered herein November 21, 1921, and to vacate the judgment entered November 29, 1921, and for leave to file an amended answer herein is granted, with ten dollars costs, and the judgment reversed, with costs.

DOWLING, SMITH, MERRELL and GREENBAUM, JJ., concur.

Orders reversed, with ten dollars costs and disbursements, plaintiff's motion to strike out answer and for judgment denied, with ten dollars costs, defendant's motion to vacate order and judgment and for leave to amend granted, with ten dollars costs, and judgment reversed, with costs.